S H O R T E R (UNITED STATES v.). See Cases Nos. 16,283 and 16,284.

## Case No. 12,812.

### SHORTRIDGE et al. v. MACON.

[Chase. 136: [1] 1 Abb. U. S. 58; 2 Am. Law Rev. 95; Phil. N. C. 392; 5 Int. Rev. Rec. 206; 1 Am. Law T. Rep. U. S. Cts. 35.]

Circuit Court, D. North Carolina. June, 1867.

PAYMENT—SEQUESTRATION—CONFEDERATE STATES GOVERNMENT—RELATION OF STATES TO GENERAL GOVERNMENT DURING WAR.

1. Compulsory payment of a debt to a receiver under the sequestration acts of the Confederate government is no defense to a suit brought upon such debt by the creditor.

[Cited in Head v. Starke, Case No. 6,293.]

2. The suspension of intercourse consequent upon the recent war, did not prevent interest from accruing between citizens adhering to the respective parties thereto.

[Cited in Keppell v. Petersburg R. Co., Case No. 7,722; Brown v. Hiatt, Id. 2,011.]
[Cited in Billgerry v. Branch, 19 Grat. 412.]

3. War levied against the United States by citizens of the republic, under the pretended authority of the new state government of North Carolina, or of the so-called Confederate government, was treason against the United States.

[Cited in U. S. v. Stark, Case No. 16,378; Stevens v. Griffith, 111 U. S. 53, 4 Sup. Ct. 285.]

4. It is the practice of modern governments when attacked by formidable rebellion, to exercise and concede belligerent rights. These are concessions made by the legislative and executive departments in the exercise of political discretion. They establish no rights except during the war.

[Cited in U. S. v. Stark, Case No. 16,378; Cuyler v. Ferrill, Id. 3,523; Bailey v. Milner, Id. 740.]

5. Courts have no policy and can exercise no political powers. They can only declare the law.

6. Legal rights could neither be created nor defeated, by the action of the government of the Confederate States.

7. The state of North Carolina by the acts of her convention in May, 1861, by the previous acts of her governor, by the subsequent acts of all departments of the state government, and by the acts of the people at the elections in May, 1861, set aside her state government and constitution, connected under the national constitution with the government of the United States, and established a new constitution and government connected with another so-called central government, set up in hostility to the United States, and entered upon a course of active warfare against the national government. By these acts the practical relations of North Carolina to the Union were suspended, but they did not for a moment effect a separation of North Carolina from the Union.

[Cited in Cuyler v. Ferrill, Case No. 3,523; Bailey v. Milner, Id. 740.]

Assumpsit, in which the plaintiffs declared upon a note executed by the defendant in 1860. The plaintiffs were citizens of Pennsylvania at the time the note was given, and continued to be such until the bringing of the suit; and during that time the defendant continued to be a citizen of North Carolina. Among other pleas, the defendant re-

[1] [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

lied upon the fact that during the existence of the late government of the Confederate States, and by virtue of certain acts of congress under that government, this debt had been confiscated, and he was compelled by process to pay it into its public treasury. It was also insisted that the state of things consequent upon the recent war between the United States and the Confederate States, was such as to excuse the defendant from payment of interest accruing during that period.

Mr. Bragg, for plaintiffs.

Rogers & Batchelor, for defendant.

CHASE, Circuit Justice. This is an action for the recovery of the amount of a promissory note, with interest. There is no question of the liability of the defendant to the demand of the plaintiffs, unless he is excused by coerced payment of the note sued upon, under an act of the self-styled Confederate Congress, passed August 30, 1861, entitled "An act for the sequestration of the estates of alien enemies," and an amendatory act passed February 15, 1862. It is admitted that the plaintiffs were citizens of Pennsylvania; that the defendant was a citizen of North Carolina; that the note sued upon was made by the defendant to the plaintiffs; and that the defendant was compelled, by proceedings instituted in the courts of the so-called Confederate States, to pay the amount due upon it to the receiver appointed under the sequestration acts. Upon these facts it is insisted that the defendant is discharged from his liability to the plaintiffs. It is claimed that, while it existed, the Confederate government was a de facto government, that the citizens of the states which did not recognize its authority were aliens, and in time of war, alien enemies; that, consequently, the acts of sequestration were valid acts; and, therefore, that payment to a Confederate agent of debts due to such citizens, if compelled by proceedings under those acts, relieved the debtor from all obligation to the original creditors.

To maintain these propositions, the counsel for the defendant rely upon the decisions of the supreme court of the United States, to the effect that the late rebellion was a civil war, in the prosecution of which belligerent rights were exercised by the national government, and accorded to the armed forces of the rebel Confederacy; and upon the decisions of the state courts, during and after the close of the American war for independence, which affirmed the validity of confiscations and sequestrations decreed against the property of non-resident British subjects and the inhabitants of colonies or states hostile to the United Colonies or United States. But these decisions do not in our judgment sustain the propositions in support of which they are cited. There is no doubt that the state of North Carolina, by the acts of the convention of May, 1861, by the previous acts of the governor of the state, by subsequent acts of all the departments of the state government, and by the acts of the people at the elections held after May, 1861, set aside her state government and constitution connected under the national constitution with the government of the United States, and established a new constitution and government connected with another so-called central government, set up in hostility to the United States, and entered upon a course of active warfare against the national government. Nor is there any doubt that by these acts the practical relations of North Carolina to the Union were suspended, and very serious liabilities incurred by those who were engaged in them. But these acts did not effect, even for a moment, the separation of North Carolina from the Union, any more than the acts of an individual who commits grave offenses against the state by resisting its officers and defying its authority, separate him from the state. Such acts may subject the offender even to outlawry, but can discharge him from no duty and can relieve him from no responsibility.

The national constitution declares that "treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." The word "only" was used to exclude from the criminal jurisprudence of the new republic the odious doctrines of constructive treason. Its use, however, while limiting the definition to plain overt acts, brings these acts into conspicuous relief as being always and in essence treasonable. War, therefore, levied against the United States by citizens of the republic, under the pretended authority of the new state government of North Carolina, or of the so-called Confederate government which assumed the title of the "Confederate States," was treason against the United States. It has been supposed, and by some strenuously maintained, that the North Carolina ordinance of 1861, which purported to repeal the North Carolina ordinance of 1789, by which the constitution of the United States was ratified, and to repeal also all subsequent acts by which the assent of North Carolina was given to amendments of the constitution,—did in fact repeal that ordinance and those acts, and thereby absolved the people of the state from all obligations as citizens of the United States, and made it impossible to commit treason by levying war against the national government. No elaborate discussion of the theoretical question thus presented seems now to be necessary. The question as a practical one is at rest, and is not likely to be revived. It is enough to say here that, in our judgment, the answer which it has received from events is that which the soundest construction of the constitution warrants and requires. Nor can we agree with some persons, distinguished by abilities and vir-

tues, who insist that when rebellion attains the proportions and assumes the character of civil war, it is purged of its treasonable character, and can only be punished by the defeat of its armies, the disappointment of its hopes, and the calamities incident to unsuccessful war.

Courts have no policy and can exercise no political powers. They can only declare the law. On what sound principle, then, can we say judicially that the levying of war ceases to be treason when the war becomes formidable? that war, levied by ten men or ten hundred, is certainly treason, but is no longer such when levied by ten thousand or ten hundred thousand? that the armed attempts of a few, attended by no serious danger to the Union, and suppressed by slight exertions of the public force, come, unquestionably, within the constitutional definition, but attempts by a vast combination, controlling several states, putting great armies in the field, menacing with imminent peril the life of the republic, and demanding immense efforts and immense expenditures of treasure and blood for their defeat and suppression, swell beyond the boundaries of the definition and become innocent in proportion to their enormity. But it is said that this is the doctrine of the supreme court. We think otherwise. In modern times it is the usual practice of civilized governments attacked by organized and formidable rebellion, to exercise and to concede belligerent rights. Under such circumstances, instead of punishing rebels when made prisoners in war as criminals, they agree in cartels for exchange, and make other mutually beneficial arrangements; and, instead of insisting upon offensive terms and designations, in intercourse with the civil or military chiefs, treat them, as far as possible without surrender of essential principles, like foreign foes engaged in regular warfare.

But these are concessions made by the legislative and executive departments of government in the exercise of political discretion and in the interest of humanity, to mitigate vindictive passions inflamed by civil conflicts, and prevent the frightful evils of mutual reprisals and retaliations. They established no rights except during war. It is also true, that when war ceased, and the authority of the regular government is fully re-established, the penalties of violated law are seldom inflicted upon many. Wise governments never forget that the criminality of individuals is not always or often equal that of the acts committed by the organization with which they are connected. Many are carried into rebellion by sincere though mistaken convictions; or hurried along by excitements due to social and state sympathies, and even by the compulsion of a public opinion not their own. When the strife of arms is over, and such governments, therefore, exercising still their political discretion, address themselves mainly to the work of conciliation and restoration, and exert the prerogative of mercy, rather than that of justice, complete remission is usually extended to large classes by amnesty or other exercise of legislative or executive authority, and individuals not included in these classes, with some exceptions of the greatest offenders, are absolved by pardon either absolutely or upon conditions prescribed by the government. These principles, common to all civilized nations, are those which regulated the action of the government of the United States during the war of the rebellion, and have regulated its actions since rebellion laid down its arms. In some respects the forbearance and liberality of the nation exceed all example. While hostilities were yet flagrant, one act of congress practically abolished the death penalty for treason subsequently committed, and another provided a mode in which citizens of rebel states, maintaining a loyal adhesion to the Union, could recover after war the value of their captured or abandoned property.

The national government has steadily sought to facilitate restoration with adequate guaranties of union, order, and equal rights. On no occasion, however, and by no act, have the United States ever renounced their constitutional jurisdiction over the whole territory or over all the citizens of the republic, or conceded to citizens in arms against their country the character of alien enemies, or admitted the existence of any government de facto, hostile to itself within the boundaries of the Union. In the Prize Cases the supreme court simply assented the right of the United States to treat the insurgents as belligerents, and to claim from foreign nations the performance of neutral duties under the penalties known to international law. These decisions recognized, also, the fact of the exercise and concession of belligerent rights, and affirmed, as a necessary consequence, the proposition that during the war all the inhabitants of the country controlled by the rebellion, and all the inhabitants of the country loyal to the Union, were enemies reciprocally each of the other. But there is nothing in that opinion which gives countenance to the doctrine which counsel endeavor to deduce from it, that the insurgent states, by the act of rebellion, and by levying war against the nation, became foreign states, and their inhabitants alien enemies. This proposition being denied, it must result that in compelling debtors to pay to receivers, for the support of the rebellion, debts due to any citizen of the United States, the insurgent authorities committed an illegal violence, by which no obligation of debtors to creditors could be cancelled or in any respect affected.

Nor can the defense in this case derive more support from the decisions affirming the validity of confiscations during the war for American independence. That war began, doubtless, like the recent civil war—in rebellion. Had it terminated unsuccessfully, and had, English tribunals subsequently affirmed the validity of colonial confiscation and se-

questration of British property and of debts due to British subjects, those decisions would be in point. No student of international law or of history needs to be informed how impossible it is that such decisions could have been. Had the recent rebellion proved successful, and had the validity of the confiscations and sequestrations actually enforced by the insurgent authorities, been afterwards questioned in Confederate courts, it is not improbable that the decision of the state courts made during and after the revolutionary war, might have been cited with approval. But it hardly needs remark that those decisions were made under circumstances widely differing from those which now exist. They were made by the courts of states which had succeeded in their attempt to sever their colonial connection with Great Britain, and sanctioned acts which depended for their validity wholly upon success; and can have no application to acts of a rebel self-styled government, seeking the severance of constitutional relations of states to the Union, but defeated in the attempt, and itself broken up and destroyed.

Those who engage in rebellion must consider the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts hostile to the rightful government are violations of law, and originate no rights which can be recognized by the courts of the nation whose authority and existence have been alike assailed. We hold, therefore, that compulsory payment under the sequestration acts to the rebel receiver of the debt due to the plaintiffs from the defendant, was no discharge. It is claimed, however, that whatever may be the right of the plaintiffs to recover the principal debt from the defendant, they can not recover interest for the time during which war prevented all communication between the states in which they respectively resided. We can not think so. Interest is the lawful fruit of principal. There are, indeed, some authorities to the point that interest which has accrued during war between independent nations can not be afterwards recovered, though the debt, with other interest, may be. But that rule, in our judgment, is applicable only to such wars. We perceive nothing in the act of July 13, 1861, which suspended for a time all pacific intercourse between the loyal and insurgent portions of the country, that requires or justifies the application of that rule to the case before us. Legal rights could neither be originated nor defeated by the action of the central authorities of the late rebellion.

The plaintiff must have judgment for the principal and interest of his debt, without deduction.

[NOTE. In the case of Bigler v. Waller [Case No. 1,404]. decided at the May term, 1870, of the circuit court of the United States for the district of Virginia, the chief justice held that, under the special circumstances of that case, interest was suspended during the civil war; and intimated a doubt as to the correctness of the above ruling.] [3]